IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01381-RMR-NRN

FRANKLIN D. AZAR & ASSOCIATES, P.C., a Colorado Corporation; and
FRANKLIN D. AZAR,

Plaintiffs,

v.

EXECUTIVE RISK INDEMNITY, INC., a Delaware Corporation,

Defendant.

---

**ORDER GRANTING
PLAINTIFF'S MOTION FOR RECONSIDERATION (Dkt. #60)**

---

**N. REID NEUREITER
United States Magistrate Judge**

This matter comes before the Court on a motion for reconsideration filed on May 22, 2023, by Plaintiffs Franklin D. Azar & Associates and Franklin D. Azar (collectively, the "Azar Firm"). *See* Dkt. #60. Defendant Executive Risk Indemnity, Inc. (the "Insurer") filed a response on May 30, 2023. *See* Dkt. #69. The Court heard argument on May 31, 2023.

The Azar Firm seeks reconsideration of this Court's discovery order issued on May 12, 2023. *See* Dkt. #58. That Order addressed whether and to what degree the Azar Firm should be entitled to review allegedly attorney-client privileged communications between the Insurer and its litigation counsel. The Azar Firm has argued (and continues to argue) that in this case, litigation counsel played the role of an insurance adjuster by making an offer of settlement and then tendering a check to the

Azar Firm. The Insurer has hired an expert who intends to opine, in part, that the tendering of the check demonstrated the Insurer's good faith conduct. The Azar Firm argues, not unreasonably, that if the tender of the check is going to used as evidence of the Insurer's good faith, then the Azar Firm should be entitled to ask questions of the person or persons responsible for the tender so as to understand the rationale for the decision. But, as the Azar Firm asserts, the two employees of the Insurer who were involved in the adjustment of the claim, disclaim any knowledge of the decision to tender the check. This leaves only the lawyers as knowledgeable parties to the decision.

In the Order of which the Azar Firm seeks reconsideration, I had denied the Azar Firm's motion to compel access to allegedly attorney-client communications related to the provision of the disputed check and the Insurer's corresponding reservation of rights. The deposition of the supervisor of the adjuster on the claim had not yet taken place. I had assumed (or perhaps, mistakenly hoped) that the deposition of the Insurer's adjustment supervisor would provide the necessary answers to "questions about the various letters, the Insurer's intent in sending the check, and the asserted reservation of rights." Dkt. #58 at 5. I therefore concluded that the Azar Firm had not established a sufficient factual basis for its assertion that litigation counsel had been acting as a claims handler or claims adjuster in connection with this case. *Id.* Now, the Azar Firm has taken the deposition of the supervisor, and the Azar firm continues to assert that the supervisor professed ignorance about the delivery of the check and the surrounding communications. Therefore, the Azar Firm today seeks reconsideration of my decision

2

denying access to the communications from counsel around the time of the sending of the disputed check and accompanying letter.

**Standard for Motion for Reconsideration**

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration. *See Hatfield v. Bd. of Cty. Comm'rs*, 52 F.3d 858, 861 (10th Cir. 1995). Instead, motions for reconsideration fall within a court's plenary power to revisit and amend interlocutory orders as justice requires. *See Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir. 1980) (citing Fed. R. Civ. P. 54(b)); *see also Houston Fearless Corp. v. Teter* 313 F.2d 91, 92 (10th Cir. 1962). However, in order to avoid the inefficiency which would attend the repeated re-adjudication of interlocutory orders, judges in this district have imposed limits on their broad discretion to revisit interlocutory orders. *See, e.g.*, *Montano v. Chao*, No. 07-cv-00735-EWN-KMT, 2008 WL 4427087, at *5–6 (D. Colo. Sept. 28, 2008) (applying Rule 60(b) analysis to the reconsideration of interlocutory order); *United Fire & Cas. Co. v. McCrerey & Roberts Constr. Co.*, No. 06-cv-00037-WYD-CBS, 2007 WL 1306484, at *1-2 (D. Colo. May 3, 2007) (applying Rule 59(e) standard to the reconsideration of the duty-to-defend order). "Regardless of the analysis applied, the basic assessment tends to be the same: courts consider whether new evidence or legal authority has emerged or whether the prior ruling was clearly in error." *Rivera v. Exeter Fin. Corp.*, No. 15-cv-01057-PAB-MEH, 2019 WL 6173666, at *1 (D. Colo. Nov. 19, 2019). Motions to reconsider are generally an inappropriate vehicle to advance "new arguments, or supporting facts which were available at the time of the original motion." *Servants of the*

3

*Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

**Background**

This is an insurance bad faith lawsuit brought by a law firm, the Azar Firm, against its insurer, Executive Risk. The Insurer had issued to the Azar Firm an Employment Practices Liability Insurance Policy for Law Firms, Policy Number 8255-1026 (the "Policy"). This insurance dispute arises out of a different lawsuit between the Azar Firm and a former employee. The Azar Firm has sued the former employee. The former employee then leveled counterclaims against the Azar Firm, seeking a variety of damages. The former employee's counterclaims triggered coverage under the Policy.

The Insurer initially took the position that it would cover 10–20 percent of the legal costs or expenses of the underlying action, asserting that only some of the underlying legal costs were covered under the Policy. There was little additional communication before this bad faith lawsuit was filed. Since the filing of this bad faith lawsuit, communication between the Insurer and the Azar firm has been through and with the Insurer's litigation counsel.

On November 30, 2022, attorney Amy Samberg, on behalf of the Insurer, sent a letter to the Azar Firm's litigation counsel entitled "SETTLEMENT COMMUNICATION PROTECTED UNDER CRE 408." Via that letter, the Insurer offered $457,596 for "the purpose of potential compromise and settlement" and that the offer was conditioned on the Azar Firm fully releasing all claims and dismissing this bad faith case. The letter also included a reservation of rights. If there had only been this single communication—a clear settlement offer, inadmissible under Rule 408—then there likely would be no additional controversy. Settlement offers are regularly made between parties' litigation

4

counsel after a lawsuit is filed, and the offers are not normally used as evidence in the litigation.

But, two weeks later, on December 14, 2022, counsel for the Insurer, Ms. Samberg, sent another letter. That letter actually included a check for $457,597. The second letter too stated that it was a settlement communication covered under Rule 408. The second letter also purported to reserve all of the Insurer's rights, including reserving the Insurer's position that only expenses to defend the former employee's defamation counterclaim (roughly 10 percent of the total legal expenses incurred by the Azar firm in the underlying case) were compensable under the Policy.

It is fair to say that these two communications (and especially, the conveyance of the check) were somewhat contradictory and confusing, as it was not clear whether cashing of the tendered check would have resulted in the waiver or release of the Azar Firm's claims in this lawsuit. The Azar Firm, through litigation counsel, sought clarification.

On January 31, 2023, a different lawyer for the Insurer, Alec Boyd, wrote back to the Azar Firm's counsel that "This email constitutes written confirmation that the check sent previously by Chubb [the Insurer] to your firm is firm payment of defense costs reimbursement and that your firm's cashing of the check will not effectuate a 'full and final settlement' of the action." Mr. Boyd later added that the check was not intended to be a settlement, but nevertheless was still "subject to a reservation of rights."

In this litigation, the Insurer now has issued an expert report citing the issuance and tender of the check in support of his opinion that the Insurer acted as a reasonable and prudent insurer under the circumstances. *See* Dkt. #60-5 at 3 (Expert Report

5

Prepared by David R. Dwares, dated March 8, 2023) ("ERI used its best efforts at that time to calculate the percentage of the total litigation costs incurred by Azar that appropriately should be allocated to the defense of all of the causes of action contained in the Counterclaim, explained why and how it completed the calculations and then it sent Azar a check for the full amount of reimbursement that it calculated at that time to be owed to Azar under the Policy.").

Thus, the Azar Firm is concerned that the Insurer intends to introduce the tender of the check into evidence at trial in support of its supposed "good faith" conduct in adjusting the claim, and that the Azar Firm has not had the opportunity to understand the motivation for sending the check, to depose the individual or individuals who were responsible for making the decision to issue the check, or even to discover the means of calculation of the percentage of total litigation costs to be paid by the insurer. In other words, the Azar Firm is complaining that it has not had a fair opportunity to challenge the validity of the Insurer's good faith defense.

**The Original Dispute**

As noted, the Azar Firm claimed that it is entitled to discovery on any post-suit (*this* suit, as opposed to the underlying fight with the former Azar Firm employee) claims-handling that occurred, including discovery about the putative "settlement" letters and the motives behind, and justification for, the issuance of the $457,597 check.

The Azar Firm further asserted that litigation counsel was necessarily involved in post-suit claims-handling. The Azar Firm argued that under established Colorado law, as exhaustively analyzed by my colleague Judge Varholak in the case of *Menapace v. Alaska National Insurance Co.*, 20-cv-00053-REB-STV, 2020 WL 6119962 (D. Colo.

6

Oct. 15, 2020), the Azar Firm should have been entitled to discovery about litigation counsel's purported claims handling activities. Citing *Menapace*, the Azar Firm argued that because litigation counsel here seemingly performed functions "traditionally performed by an insurance company in its normal course of handling a claim, evidence of such activities are relevant, discoverable and admissible in bad faith actions such as this." Dkt. #47 at 7. And, even if the lawyers were not performing claims-handling activities, the Azar Firm argues that under the sword-shield principle, the Insurer should not be allowed to use evidence of the supposed claim payment letter and associated check as evidence of good faith, without allowing discovery into the motivation for that tender, including arguably privileged documents that may provide insight into the Insurer's decision-making process.

The Insurer, for its part, disputed that its litigation attorneys have in any way been involved in any formal "claims handling." Per the Insurer, it is normal, once a lawsuit is filed, for communications between an insurer and its insured to be directed between counsel. That letters were sent by the Insurer's litigation counsel does not mean that litigation counsel acted as a claims-handler and is by no means a waiver of the attorney-client privilege. The Insurer's position is that "[n]othing that Clyde and Co. [Insurer's litigation counsel] has done during this lawsuit amounts to claims handling. At all times, Clyde & Co. was litigation counsel, including in communicating with its counterparts representing [the Azar Firm.]" Dkt. #50 at 9.

The Insurer disclosed two people with knowledge of how this claim was adjusted—an adjuster and a supervisor. As of the date of the original argument on this issue, the Azar Firm had deposed the adjuster, but not the supervisor. The Insurer

7

represented to the Court that the supervisor would be able to answer questions about the various letters, the Insurer's intent in sending the check, and the asserted reservation of rights.

At the time I issued my Order of May 12, 2023 (Dkt. #58), I had presumed that a deposition of the Insurer's supervisor (or perhaps a Rule 30(b)(6) deposition of the Insurer) would provide the discovery the Azar Firm sought about the decision-making process behind the arguably conflicting letters and how the amount of the payment check was calculated. Therefore, in my original Order, I agreed with the Insurer that there was no basis for law firm Clyde & Co.'s communications with its litigation client, the Insurer, to be subject to discovery. I determined that the Azar Firm simply had not established a sufficient factual basis for the Court to conclude that the Insurer's litigation counsel (Clyde & Co.) was acting as a claims handler or claims adjuster in connection with this case. *See generally* Dkt. #58.

**The Azar Firm's Motion for Reconsideration**

The Azar Firm seeks reconsideration of the May 12, 2023 Order. The Azar Firm has now taken the deposition of the Insurer's supervisor and reviewed the updated privilege log provided by the Insurer. According to the Azar Firm, the supervisor, Mr. John Fisher, was not familiar the correspondence in question from his own personal knowledge. Although Mr. Fisher had approved the payment check, he had not written the disputed letters. Instead, he was just shown the correspondence and subsequent emails in preparation for his deposition and was "told this needs to be [his] position." Dkt. #60-3 at 3. In addition, whenever counsel for the Azar Firm asked questions about who wrote the letter(s) or the source of information in the letters(s), it was met with an

8

objection and Mr. Fisher was instructed by his counsel not to answer. *See, e.g.,* Dkt. #60-3, Dep. 29:9-19) (instruction not to answer question whether attorney Samberg gave Mr. Fisher the November 30, 2022 letter to approve); *id.,* Depo. 30:7-14 (instruction not to answer question who wrote the November 30, 2022 letter); *id.*, Dep. 31:8-16 (instructing not to answer as to who did the calculation of the $457,000 claim payment); *id.*, Dep. 31:23-32:5 (instruction not to answer based on attorney-client privilege the question of "who do I talk to, to see how that math . . . was calculated").

At oral argument on the Motion for Reconsideration, defense counsel for the Insurer gave an explanation for the calculation of the payment, for why there was initially a settlement offer which then transmogrified into a claim payment, and for why there was a reservation of rights. But counsel presumably will not be testifying at trial, and the witnesses that the Insurer has disclosed as having knowledge about these issues failed to answer many of the relevant questions.

Thus, the Court comes to two conclusions about this situation: Number 1: To the extent litigation counsel was calculating the claim payment and then getting "approval" from the supervisor to send the letter tendering the payment, litigation counsel was acting as a claims adjuster within the meaning of the *Menapace* decision; and Number 2: to the extent that the Insurer is seeking to use the tender of $457,000 to demonstrate its good faith in handling this claim, while simultaneously withholding as attorney-client privileged the internal documents that would explain the reasoning and calculation behind the decision to tender the $457,000 while reserving all rights, the Insurer is running afoul of the sword/shield doctrine which prohibits a party from using evidence against an adversary while simultaneously asserting privilege over aspects of that same

9

evidence. *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc,* 136 F.3d 695, 704 (10th Cir. 1998) ("a litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion"); *Mountain States Tel. & Tel. Co. v. DiFede*, 780 P.2d 533 (Colo. 1989) (explaining that attorney-client privilege is waived where the client places the subject matter of the privileged communication in issue or, where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information).

In the attorney-client privilege context, the Colorado Supreme Court has found an implied waiver of the privilege where (1) assertion of the privilege was a result of some affirmative act by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. *DiFede*, 780 P.2d at 543–44.

Here, the Insurer has committed an affirmative act by disclosing an expert report that relies in part on the $457,000 claim payment and surrounding communications. This puts the protected information at issue by making it relevant to the case. And application of the privilege in this instance would deny the Azar Firm access to documents that explain the reasons for the payment and associated reservation of rights, and would prevent the Azar Firm from challenging the assertion of good faith by the Insurer.

The Court therefore concludes that the Azar Firm's Motion for Reconsideration (Dkt. #60) of the original discovery decision should be **GRANTED**. The changed circumstance that justifies reconsideration of my prior discovery decision is the fact that the Insurer's supervisor was unable to cogently respond to questions about the tender of the check for payment of defense costs, the reasons for the payment, or the associated communications.

Given that the Insurer seeks to have its expert rely on the tendered check as evidence of the Insurer's good faith, and the Insurer has not provided a percipient witness to explain the origin of the payment, its amount, or the apparent contradictions between the alleged "settlement" letters and the payment, the Court finds that the Insurer has waived, under the sword-shield doctrine, claims of attorney-client or attorney work privilege surrounding the internal communications (or Insurer-attorney communications) that would tend to explain the issuance of the claim payment check and calculation of the amount. To the extent that the calculations of the amount of the check were done by counsel, then counsel was acting as a claims handler, and not an attorney in connection with such calculations. Such calculations, or documents reflecting such calculations would not be privileged under the principles outline in *Menapace*.

Unfortunately, it is possible that unrelated legal conclusions and strict advice of a legal nature is intermixed with information about the lawyers' involvement in communications about the claim payment tender. Therefore, it will be necessary for the Court to conduct an in camera review of documents which may be relevant to these issues. *See, e.g., Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Ct. for the City and*

*Cnty. of Denver*, 718 P.2d 1044, 1045–49 (Colo. 1986) (concluding that attorney-client privilege did not protect portion of attorney-generated memorandum which included factual investigation relating to issuance of policy, but that portion of memorandum which contained legal conclusions and advice of a legal nature were properly withheld); *Plaza Ins. Co. v. Lester*, No. 14-cv-01162-LTB-CBS, 2015 WL 3528336, at *5 (D. Colo. June 4, 2015) (court conducted document-by-document in camera review to determine whether retained counsel's involvement was investigative and non-legal in nature, rather than for purpose of providing advice about insurer's exposure and legal obligations).

The Court will therefore accept in part the Insurer's suggestion as to how to proceed. Within five days from the date of this Order, Plaintiff shall identify and designate for the Defendant specific documents of interest from Defendant's revised privilege log. *See* Dkt. #60-1. The date range of the potential documents shall be from November 28, 2022 to February 10, 2023.

Within seven days from the receipt of Plaintiff's designation of documents, Defendant will deliver to the Court for in camera review unredacted copies of all the designated documents. However, Defendant shall mark (either electronically with redline or highlighter, or by other means), those portions of the documents that Defendant believes should nevertheless remain privileged because those portions relate to pure legal advice that is unassociated with or unrelated to the tender of the

check for payment of defense costs. The Court will then review the materials and make a final determination as to what ultimately should or should not be produced to the Plaintiff.

**It is SO ORDERED.**

Dated: June 28, 2023                                    BY THE COURT:

_____